Filed 11/22/13  In re Y.C. CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re Y. C., A Person Coming Under the Juvenile Court Law. | B248280 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | (Los Angeles County Super. Ct. No. CK74453) |
| Plaintiff and Respondent, | |
| v. | |
| Y.G., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Anthony Trendacosta, Judge.  Reversed and remanded.

Suzanne Davidson, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Peter Ferrera, Senior Deputy County Counsel, for Plaintiff and Respondent.

The dependency court entered judgment declaring five-month-old Y.C. a dependent of the court and removing her from the physical custody of Y.G. (mother). Mother challenges the removal order on the grounds that there was no substantial evidence showing that (1) Y.C. would be in substantial danger if she were returned to mother or (2) that there were no reasonable means by which Y.C. could be protected without removing her from mother's custody. We agree.

### FACTUAL AND PROCEDURAL BACKGROUND

In 2004, when mother was fourteen years old, she became pregnant with her first child.[1] At the time, mother was a juvenile court dependent due to her father's (maternal grandfather) physical and sexual abuse of her and her siblings, and her mother's (maternal grandmother) refusal to address the abuse. Mother's first child was detained and placed in foster care when mother allowed him to reside with maternal grandparents despite the sustained allegations of abuse against them in mother's dependency case. Mother failed to reunify with that child.

On June 28, 2012, mother gave birth to Y.C. At that time, mother had been "together" with Raymond C. (father) for almost five years. On August 14, 2012, an anonymous caller reported to the Department for Children and Family Services (Department) that mother and father engaged in domestic violence four to six times a month, and that, the previous week, law enforcement had been called to the home

---

[1] We hereby take judicial notice of our prior opinion in *In re Ismael* (B247456; filed on October 23, 2013) [nonpub. opn.]. (Evid. Code, § 452, subd. (d).)

because father had " 'socked and scratched' " mother while she was holding Y.C.[2] The caller also stated that father sells marijuana and frequently smokes marijuana in the car with his children.

Later that day, a Department social worker investigated the allegations. Mother denied that there had been any domestic violence or that father used marijuana. Mother also stated that she would never risk having her daughter removed from her custody. A friend of mother's stated that when mother and father have an argument, mother will leave with her baby and will return when "things have cooled down."

Father was visibly upset by the social worker's visit, and stated that his brother was a drug addict and continuously made false reports about him. Father said that his brother recently went to his family's home and attacked his sister, at which time, father stepped in to protect her. Father believed that his brother called in the referral to retaliate against him and showed the social worker a copy of a restraining order he had obtained against his brother.

The social worker also interviewed the other children who resided in the home. Y.C.'s six-year-old half-sister denied that there were any physical altercations in the home, or that father smoked anything in her presence. Father's 14-year-old nephew

---

[2]     There is an inconsistency in the Department's records: the Department's reports provide varying accounts of the caller's statements. Initially, the Department stated that the caller said that *mother* " 'socked and scratched' " father. Later on, the Department reported that the caller said that *father* " 'socked and scratched' " mother As the only evidence substantiating the caller's statements indicated that father hit mother, we assume that the second account is accurate.

also denied that mother and father had engaged in domestic violence or that there was any substance abuse in the home.

Two months later, on October 15, 2012, the Department obtained a copy of the police report regarding a report mother had made on August 11, 2012. The report stated that mother had told the police that father had become upset about her going to a club, and had attempted to grab her, scratching her chest. Mother also said that on August 8, 2012, she had argued with father and he had "pushed his knuckle" into her left eye. The officers observed a scratch to the victim's chest and a bruise under her left eye. On October 19, 2012, a Department social worker visited father at his home address. Father denied hitting mother. The social worker then contacted mother on the phone, and mother also denied any history of domestic violence. The social worker observed during the visit that maternal grandmother was holding Y.C.

The social worker filed a request for authorization for removal of Y.C. on the grounds that she was "in danger of physical [] abuse." The court granted authorization and on October 24, 2012, the Department removed Y.C. from her home. A petition was filed alleging that Y.C. was at risk of physical harm under Welfare & Institutions Code[3] section 300, subdivisions (a)[4] and (b),[5] because, on August 8 and 11, 2012, mother and

---

[3]   All further statutory references are to the Welfare and Institutions Code.

[4]   Section 300, subdivision (a), provides that a child comes within the jurisdiction of the juvenile court when there is a substantial risk the child will suffer serious physical harm inflicted nonaccidentally upon the child by the child's parents.

father had engaged in violent altercations in which father had scratched mother's chest and pushed his knuckles into mother's left eye.

At the detention hearing, on October 30, 2012, mother informed the court that she had moved out of the home with father and obtained her own residence. Mother also argued that the police report was two and one-half months old and there was no evidence that there had been any incidents since it was filed. Mother asked the court not to detain her infant on the grounds that she had taken steps to protect herself and had enrolled in parenting and domestic violence programs. Lastly, mother represented that she was willing to "to do whatever this court asks and orders in terms of a safety plan" in order to protect Y.C.

The Department argued that mother had received extensive reunification services in her other dependency case and had not demonstrated a commitment to therapy or dealing with her "issues." The Department further argued mother had allowed maternal grandmother to care for Y.C., even though there was a court order in her other dependency case that maternal grandmother not have contact with mother's first child.[6] Lastly, the Department argued that mother had not taken responsibility for having initiated contact with the police but now denied that domestic violence had occurred.

---

[5]     Section 300, subdivision (b), provides a basis for juvenile court jurisdiction when there is a substantial risk the child will suffer serious physical harm or illness as a result of the parent's failure to adequately supervise or protect the child.

[6]     The Department in the Detention Report argued that, even though maternal grandparents were separated, maternal grandmother was still a threat and put the infant "at substantial risk."

The court indicated that it was not considering mother's other dependency case at this juncture. The court found that there was a prima facie case for detaining Y.C. on the grounds that the parents continued to deny the incidents of domestic violence, and "the parents didn't have a burst of enlightenment in terms of the services in this case until the removal order was filed." The court ordered the Department to provide mother and father with family reunification services, and to assess mother's new home for safety. Y.C. was placed in foster care.

In the Jurisdiction/Disposition Report, the Department reported that a social worker had interviewed mother and father again in early December. Mother and father denied that father had punched mother, but admitted there had been less severe physical altercations. The Department recommended that the court sustain the allegation that Y.C. was at risk of physical harm on the grounds that mother and father had admitted that father had "pulled on the mother's sleeve in order to prevent her from leaving with their mutual child . . . caus[ing] [a] light mark" on mother. In addition, mother and father had both acknowledged that mother had "pushed" father "out of the way" when attempting to enter their house.

On these grounds, the Department also recommended removing Y.C. from her parents' physical custody because "the mother and the father are both unable to understand and/or acknowledge that the 'pulling' of shirt and the 'shoving out of the way' can lead to and/or create a detrimental home environment, which can later place the children at risk." The report also noted that mother had consistently visited Y.C. and there were "no concerns" about her visits. In addition, mother had reported that she

6

was self-employed as a hair dresser and had a stable income sufficient to provide for her child's needs.

On December 18, 2012, the court held a jurisdictional and dispositional hearing. At the hearing, mother's domestic violence counselor testified that mother had told him she had been punched by father in August. The counselor further testified that mother had "made tremendous progress," that she was "voluntarily attending two [] victims classes a week," that mother had been actively doing her homework assignments, that she had been doing "excellent" work on those assignments, that mother was "addressing the issues of domestic violence that have been in her life" and "growing," that mother was doing "very well" in her anger management program, that was mother was also attending individual counseling sessions. The counselor also testified that father was also enrolled in the domestic violence program taught by the counselor but that father attended classes at a different time than mother, and that mother and father lived at separate addresses. Mother also presented evidence that she was attending parenting classes, and that her "parent educator" said she "show[ed] maturity regarding parenting information - despite her youth she seems anxious to complete her classes and do what's necessary to reunify her family. Excellent attendance!"

Mother argued that there was insufficient evidence that she had failed to protect Y.C. Mother further argued that there were no grounds for removal because she was living in a separate residence from father, and the Department had not shown that there would be a risk to Y.C. if she were released to mother with a safety plan. Mother also

7

informed the court that the Department had not assessed her home for safety as ordered by the court on October 30, 2012, and renewed her request for such an assessment.

Father argued there was no evidence Y.C. was at risk of suffering serious physical harm pursuant to section 300, subdivision (a), because mother was not holding the baby during the altercation when father grabbed her shirt. The Department argued that mother had lied about being punched when interviewed by the social worker and that, therefore, mother had not made "any progress with respect to dealing with domestic violence."

The court struck the allegations under section 300, subdivision (a), and sustained the subdivision (b) count on the grounds that "mother had engaged in a violent altercation in the presence of the child," that mother's varying accounts about the domestic violence showed that she exhibited "classic battered spouse syndrome," and that "although she's making progress, [she] hasn't gotten over the threshold, as far as the court's concerned, to convince me that we aren't going to have another round of this." The court also ordered that Y.C. be removed from her parents' custody on the grounds that there was "clear and convincing evidence [that] continuance in the home of the parents is contrary to the child's welfare, and that a substantial danger exists to the physical health, safety, protection, physical and emotional well-being. And there are no reasonable means [by] which the child may be protected without removal." The court

did not state the facts on which the decision to remove the child was based. Mother timely appealed.[7] [8]

## *CONTENTIONS*

Mother contends that there was no substantial evidence supporting the court's order removing Y.C. from her custody.[9]

---

[7]     The Department's Progress Report dated February 20, 2013 was submitted with the record on appeal and provides that, since the court's jurisdiction/disposition hearing, mother has been compliant with the case plan, continues to participate in court-ordered counseling, continues to be an active participant in her anger management class, and is receiving individual counseling. The Department further reported that mother visits with Y.C. three times a week for two hours each day and is "appropriate and nurturing with the child," and that "[Y.C.] appeared to be very familiar and comfortable in her mother's care." Father also visited with Y.C. but the Department reported that he "waits until the mother [] leaves before commencing his visitation." The Department recommended that the court grant the Department discretion to liberalize visitation for mother to include extended and overnight visits. On February 20, 2013, the court ordered unmonitored visits for mother for up to three hours.

[8]     After this appeal was filed, the court returned Y.C. to mother's custody at the six-month review hearing.

[9]     Although mother does not challenge the court's jurisdictional findings, we note that there was no substantial evidence supporting them. Where there is no evidence the child has suffered serious physical harm or illness as a result of family violence, the allegation of jurisdiction must be supported by evidence the violence is (1) ongoing *and* (2) the child is at substantial risk of such harm *at the time* of the jurisdiction finding. (*In re Daisy H.* (2011) 192 Cal.App.4th 713, 717.) Here, there was no evidence of any domestic violence between mother and father after August 2012, and no evidence that Y.C. was at risk *at the time* of the jurisdiction finding when mother was living separately from father. (See also *In re J.N.* (2010) 181 Cal.App.4th 1010, 1023-1024 [to "conclud[e] that section 300, subdivision (b), authorizes dependency jurisdiction based upon a single incident resulting in physical harm absent *current risk*" would "elevate form over substance and lead to absurd results where the evidence indicates an absence of current risk." (Emphasis added.)])

9

## DISCUSSION

1.  *Standard of Review*

" '[I]n dependency proceedings the burden of proof is substantially greater at the dispositional phase than it is at the jurisdictional phase if the minor is to be removed from his or her home.' [Citation.]" (*In re Henry V.* (2004) 119 Cal.App.4th 522, 528.) When a child is removed from the custody of her parents, the clear and convincing burden of proof applies. (§ 361, subd. (c)(1).) "This heightened burden of proof is appropriate in light of the constitutionally protected rights of parents to the care, custody and management of the children. [Citations.]" (*Id.* at p. 529.) On appeal, "the substantial evidence test applies to determine the existence of the clear and convincing standard of proof . . . . " (*In re Amos L.* (1981) 124 Cal.App.3d 1031, 1038.)

2.  *There Is Insufficient Evidence Supporting the Court's Removal Order*

Section 361, subdivision (c), the statute governing removal, prohibits the juvenile court from removing a minor child from the physical custody of the parent(s) with whom the child resided at the time the petition was initiated, "unless the juvenile court finds clear and convincing evidence . . . . [¶] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).) "The court shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (d).)

10

"A dispositional order removing a child from a parent's custody is 'a critical firebreak in California's juvenile dependency system' (citation), after which a series of findings by a preponderance of the evidence may result in termination of parental rights. . . . [O]ur dependency system is premised on the notion that keeping children with their parents while proceedings are pending, whenever safely possible, serves not only to protect parents' rights but also children's and society's best interests. Our society does recognize an 'essential' and 'basic' presumptive right to retain the care, custody, management, and companionship of one's own child, free of intervention by the government. [Citations.] Maintenance of the familial bond between children and parents—*even imperfect or separated parents*—comports with our highest values and usually best serves the interests of parents, children, family, and community. Because we so abhor the involuntary separation of parent and child, the state may disturb an existing parent-child relationship only for strong reasons and subject to careful procedures." (*In re Henry V., supra,* 119 Cal.App.4th at pp. 530-531 [emphasis added].)

Section 361, subdivision (d) requires the trial court to state on the record the facts that led the court to order removal.[10] Here, the court did not state the factual basis for removing Y.C., but only stated on the record that there was "a substantial danger exists to the physical health, safety, protection, and physical and emotional well-being [of the minor]" and "there [we]re no reasonable means [by] which the child may be protected

---

[10]     Section 361, subdivision (d), provides that "[t]he court shall state the facts on which the decision to remove the minor is based."

11

without removal." Failure to make the required findings under section 361 is error. (*In re Jason L.* (1990) 222 Cal.App.3d 1206, 1218.) Moreover, the error was not harmless, as explained below.

The evidence presented by the Department was not sufficient to support an out-of-home placement under the controlling clear and convincing evidence standard. Section 361, subdivision (c)(1), requires both that (1) "[t]here is or would be a substantial danger" to the minor if the minor were returned home, *and* (2) that "there are no reasonable means by which the minor's physical health can be protected" without removing the minor from the home. " 'Clear and convincing' evidence requires . . . evidence [that is] ' "so clear as to leave no substantial doubt"; "sufficiently strong to command the unhesitating assent of every reasonable mind." ' [Citation.]" (*In re Angelia P.* (1981) 28 Cal.3d 908, 919, superseded by statute on other grounds as stated in *In re Cody W.* (1994) 31 Cal.App.4th 221, 230.)

First, there was insufficient evidence that there was a substantial danger to Y.C. if she were returned to mother's custody.[11] At the time of the jurisdiction/disposition hearing on December 18, 2012, mother was living on her own and there was no evidence that there had been any further incidents of domestic violence since early August 2012. There was also no evidence that mother and father maintained any contact. Rather, the evidence indicated that they lived separately and attended classes at different times to avoid each other. Furthermore, the evidence showed that mother had

---

[11] The court found that "continuance in the home *of the parents*" posed a substantial danger to Y.C. (Emphasis added.) However, such a finding was irrelevant because, at that time, mother had moved out and established her own separate residence.

actively participated in counseling and classes. This evidence does not suggest that Y.C. would be in "substantial danger" had she been returned to mother's care.

Second, there was insufficient evidence that there existed "no reasonable means" by which Y.C. could be protected if returned to mother. Mother had taken multiple steps to ameliorate the conditions that led to the domestic violence in the first place: she had established her own residence, and worked hard to improve her parenting skills through taking multiple classes. Her instructors called her efforts and attendance "excellent" and felt she was making substantial progress. In addition, mother said she was willing to undertake whatever safety measures the court ordered to protect Y.C. All of this evidence shows that the court could reasonably have returned Y.C. to mother under strict supervision.

Although the Department attempted to direct the juvenile court's attention to mother's failed efforts to reunify with her older child, we do not find it implausible to believe that mother has changed as a parent: she was fourteen years old when she became pregnant with her first child and was herself a minor in the dependency system. She is now twenty-two and the evidence in the record consistently shows her dedication to taking all steps needed to reunify with her daughter.

### DISPOSITION

The dispositional order is reversed. The matter is remanded for further proceedings consistent with the views expressed in this opinion.


### NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

13

                                                    CROSKEY, J.

WE CONCUR:



        KLEIN, P. J.



        ALDRICH, J.